**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GORKA PIKABEA, individually and on behalf of all others similarly situated, | Case No. 1:26-cv-3238 |
| *Plaintiff,* | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SHAW WALTERS, ELIZA LABS, INC., SEBASTIAN QUINN-WATSON, AI16Z DAO, and DOES 1 THROUGH 50, | |
| *Defendants.* | |

1

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 3 |
| II. | PARTIES | 5 |
| III. | JURISDICTION AND VENUE | 7 |
| IV. | FACTUAL ALLEGATIONS | 9 |
| V. | CLASS ALLEGATIONS | 22 |
| VI. | CLAIMS FOR RELIEF | 25 |
| VII. | PRAYER FOR RELIEF | 31 |
| VIII. | JURY DEMAND | 33 |

## I. PRELIMINARY STATEMENT

1. The Defendant's scheme was simple, yet effective. Defendant Walters borrowed fame and trust from elite institutions. With this undeserved fame, the Defendants promised to develop revenue generating technologies. The Defendants sold crypto tokens associated with these projects. The market soared, for some time but when the truth was revealed, the projects collapsed, damaging the Plaintiffs.

2. Initially, Defendants built what appeared to be an artificial intelligence technology startup, complete with a professional website, developer documentation, open-source code repositories, institutional partnerships, a venture capital fund, and the appropriated brand of one of the most prominent firms in Silicon Valley.

3. They did everything a real technology company does, except build a real technology company.

4. The token, first called $AI16Z and later rebranded as $ELIZAOS, launched on the Solana blockchain on October 24, 2024.

5. The project's credibility rested on two pillars. The first was a manufactured association with Andreessen Horowitz ("a16z"), achieved by naming the project "ai16z" and branding the AI agent "Marc AIndreessen."

6. The second was a comprehensive digital infrastructure, consisting of a website, documentation portal, GitHub repositories, and claimed partnerships, designed to make the project indistinguishable from a real technology company to anyone conducting ordinary due diligence.

7. Within days of the launch, Marc Andreessen acknowledged the project on X, and the token's market capitalization surged to $80 million.

8. In the months that followed, Defendants layered additional credibility through a paid partnership with Stanford University, a whitepaper published on arXiv, a $10 million venture fund with Jupiter Exchange, media coverage in CoinTelegraph, CoinDesk, and Yahoo Finance, and a promotional tour through Asia. Each development followed the trajectory of a real startup, sustaining or inflating the token's price along the way.

9. None of it was real in the way it appeared. The AI agent that was supposed to manage an autonomous investment fund was operated by humans. The open-source framework generated no licensing fees or subscription revenue. The project produced no revenue of any kind during the Class Period.

10. The token's price was driven entirely by the traditional crypto scheme: a carefully engineered narrative and effective market manipulation.When elements of that narrative were disturbed, the price collapsed.

11. On January 2, 2025, the token reached an all-time high of approximately $2.47, with a market capitalization exceeding $2.6 billion. The next day, large holders began liquidating: one sold $2.52 million worth of tokens, another $2.49 million, a third $4.77 million. By January 11, on-chain data showed the most profitable trader had realized $39 million in profit. Public purchasers absorbed the losses.

12. When Andreessen Horowitz demanded that Defendants stop using the a16z name, Defendants did not wind down. They rebranded to ElizaOS, executed a token migration that expanded total supply tenfold, and allocated 40% of new tokens to insiders, including 15% to undisclosed private investors and 10% to team and contributors.

13. The rebrand allowed Defendants to present a fresh story to a fresh audience through cross-chain expansion to Ethereum, Base, and BNB Chain.

14. Regulated markets eventually responded. Korean DAXA member exchanges listed the token as a "trading warning" coin. Coinbase suspended perpetual contract trading. At least 3,945 wallet addresses reflecting customer holdings sustained losses.

15. Plaintiff brings this class action on behalf of all persons who purchased $AI16Z tokens (subsequently migrated to $ELIZAOS) during the period from October 24, 2024 through the date of the filing of this Complaint (the "Class Period").

16. Plaintiff seeks damages and equitable relief under New York General Business Law §349 (Deceptive Acts and Practices), New York General Business Law §350 (False Advertising), California Business and Professions Code §17200 et seq. (Unfair Competition Law), California Business and Professions Code §17500 et seq. (False Advertising Law), and common law theories of negligent misrepresentation and unjust enrichment, on behalf of Plaintiff and such members of the proposed Class whose claims arise under those laws.

## II. PARTIES

**Plaintiff**

17. Plaintiff Gorka Pikabea is an individual and a resident of Spain. During the Class Period, Plaintiff purchased $AI16Z tokens in reliance on the overall appearance of legitimacy created by Defendants' website, developer documentation, claimed institutional partnerships, media presence, and the perceived affiliation with Andreessen Horowitz.

18. Plaintiff suffered financial losses in the hundreds of dollars as a direct result of Defendants' scheme. Plaintiff brings this action individually and on behalf of all similarly situated persons and entities.

**Defendants**

19.   Shaw Walters ("Walters") is the architect of the scheme. He founded Eliza Labs, launched the $AI16Z token in October 2024, and served as the project's primary promoter and decision-maker throughout the Class Period. Walters controlled the project's public communications through his X account @shawmakesmagic.

20.   Walters personally endorsed affiliated token launches, conducted a promotional tour through Shanghai, Beijing, and Hong Kong in December 2024, and directed the allocation of billions of newly created tokens to entities he controlled during the migration.

21.   Walters was physically present and conducting business in New York during the Class Period, including as a featured judge at the SolanAmerica NYC | Alliance & Solana Ideathon event in New York on January 15, 2025.

22.   Eliza Labs, Inc. ("Eliza Labs") is a Delaware corporation headquartered in San Francisco, California, with a principal place of business at 2 Embarcadero Center, Floor 8, San Francisco, California 94111. Founded in 2024, Eliza Labs is the corporate vehicle through which Walters operated the scheme. Eliza Labs develops the ElizaOS framework, operates the Auto.fun launchpad, and controls the project's treasury and token operations.

23.   Sebastian Quinn-Watson is the Secretary of Eliza Labs, Inc., as reflected in filings with the California Secretary of State. His business address is 2 Embarcadero Center, Floor 8, San Francisco, California 94111. During the Class Period, Quinn-Watson served in a senior leadership role within Eliza Labs and the AI16Z project, contributing to the development, promotion, and execution of the enterprise.

24.     AI16Z DAO is an unincorporated association on the Solana blockchain. It purportedly served as the project's governance and treasury vehicle. In practice, Walters and Eliza Labs controlled the DAO, with no meaningful independent governance.

25.     Does 1 through 50 are individuals and entities whose true names and capacities are unknown to Plaintiff. Plaintiff will seek leave to amend this Complaint when their identities are ascertained.

## III. JURISDICTION AND VENUE

**Subject Matter Jurisdiction**

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2), the Class Action Fairness Act ("CAFA"), because: (a) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (b) the proposed Class consists of more than 100 members; (c) at least one member of the proposed Class is a citizen of a different state than at least one Defendant; and (d) upon information and belief, members of the proposed Class include citizens or subjects of a foreign state.

**Personal Jurisdiction**

27.     This Court has personal jurisdiction over Defendant Walters pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), incorporating New York's long-arm statute, N.Y. C.P.L.R. §302(a). Walters was physically present in New York and conducting business activity tied to the scheme during the Class Period.

28.     On January 15, 2025, Walters served as a featured judge at the SolanAmerica NYC | Alliance & Solana Ideathon, a blockchain industry event hosted by Alliance and the Solana Foundation in New York, New York. Walters appeared at this event in his capacity

as the founder of ai16z, less than two weeks after the token reached its all-time high of approximately $2.5 billion in market value.

29. Walters used the event to advance the project's visibility and credibility within the blockchain industry, furthering the promotional apparatus through which consumers were induced to purchase the token.

30. On January 3, 2026, Walters publicly indicated his ongoing physical presence in New York on X when, in response to a follower's inquiry about his dog, he stated: "If you come to New York you will meet him." This statement confirms that Walters continued to be present in New York during the ongoing Class Period.

31. The foregoing allegations establish that Walters transacted business in New York within the meaning of C.P.L.R. §302(a)(1) and committed tortious acts in the state within the meaning of C.P.L.R. §302(a)(2).

32. This Court has personal jurisdiction over the remaining Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), incorporating N.Y. C.P.L.R. §302(a). Defendants transacted business in New York, committed tortious acts within the state, and committed tortious acts outside the state causing injury within New York to persons and businesses within the state, while regularly doing or soliciting business, engaging in a persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered in New York.

33. Defendants' deceptive conduct was directed at consumers nationwide, including consumers in New York. The tokens were marketed and sold through public channels accessible to New York residents who purchased tokens and suffered losses.

**<u>Venue</u>**

34.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claims occurred here, including Walters' January 15, 2025 appearance at the SolanAmerica NYC event, and the scheme's deceptive conduct reached and injured consumers in this District.

## IV. FACTUAL ALLEGATIONS

### October 2024: The Launch

35.    On October 24–25, 2024, Defendants launched the $AI16Z token on the Solana blockchain through the DAOs.fun platform with an initial raise of approximately $75,000. The token was priced between $0.02 and $0.06.

36.    From the outset, Defendants branded the project as an AI-managed venture fund, a fund operated by an autonomous AI agent that would make investment decisions on behalf of token holders.

37.    The project was named "ai16z," a deliberate echo of "a16z," the universally recognized abbreviation for Andreessen Horowitz, one of the world's most prominent venture capital firms.

38.    The AI agent was branded "Marc AIndreessen," directly appropriating the name and persona of Marc Andreessen, the firm's co-founder. No evidence of authorization, consent, or endorsement from Andreessen Horowitz has been identified.

39.    The naming was designed to cause consumers to infer a connection between the project and the firm, an inference that was false but that drove every subsequent stage of the scheme.

40. On October 27, 2024, three days after the launch, Marc Andreessen acknowledged the project with a post on X. The token's market capitalization surged to $80 million in a single day.

41. Any engagement from a16z-affiliated individuals, however casual, could be interpreted by investors as tacit approval. That was precisely the inference the naming had been designed to produce, and the market responded accordingly.

42. On October 30, 2024, the publication Protos reported that the AI fund's investment decisions were made by humans, not by autonomous AI software. Defendants responded by shifting the project's emphasis toward the ElizaOS framework, replacing one narrative with another, rather than acknowledging the truth.

**November 2024: Manufactured Momentum**

43. On November 4, 2024, Defendant Walters provided an update discussing the progress of the project. He tweeted that integration was "almost done". This announcement was a signal to holders of the tokens that progress on the project was moving forward. In the blockchain industry, these announcements are a standard technique for sustaining anticipation among token holders.

44. On November 18, 2024, Walters posted on X seeking a contact at Andreessen Horowitz. Eddy Lazzarin, the CTO of a16z Crypto, publicly replied "Check your DMs."

45. The "ongoing dialogue" framing suggested a potential partnership without confirming anything. Defendants had built the project so that any interaction with a16z personnel, however informal or ambiguous, would be amplified as evidence of the institutional affiliation the naming had manufactured. The market responded exactly as the project was designed to make it respond.

46. The Defendant's deception was not limited to borrowed fame from existing firms. The Defendants also used their own brand to launch cloned tokens to exploit their investors.

47. Anticipating issues with their unlicensed use of the a16z brand, Defendants prepared a second token that would replace the ai16z token. Conceptually this new token would be a swap, where retail investors could swap their ai16z tokens to the new token ELIZA. But before that plan was made public, a separate $eliza token appeared on the vvaifu.fun platform.

48. On November 9, 2024, Walters publicly stated on X that ai16z was not going to create a coin and welcomed the community to launch their own tokens. This statement was materially misleading. By Walters' own subsequent admission, he and a partner team had been working on their own Eliza-branded token for approximately two weeks at the time he made it.

49. On November 16–17, the $eliza token was generated on the vvaifu.fun platform. A 7% airdrop was sent to the ai16z treasury, creating a direct financial link between the ostensibly "community-driven" token and the core team. Walters did not disavow the $eliza token, and the treasury allocation ensured his project profited from it.

50. On November 19, 2024, a new token, $ELIZA suddenly appeared on the Solana blockchain. Within ten minutes it surpassed a $20 million market cap. That afternoon, Walters posted the $ELIZA contract address on X and acknowledged that he and a partner team had been preparing the launch for the prior two weeks.

51. This directly contradicted his November 9 statement. The two-week planning window meant insiders had advanced knowledge and could position themselves before the public

11

announcement, while the November 9 statement served to suppress the existing $ELIZA token's price.

52.     Within fifteen minutes of Walters' post, $eliza crashed approximately 87%, dropping from a high of approximately $0.08 to a low near $0.009. $ELIZA surged past $80 million in market capitalization within one hour. Retail holders of the original $eliza lost most of their value overnight. Walters then hosted a Twitter Space titled "Eliza Awakens," during which the main ai16z token dropped from approximately $500 million to $300 million in market capitalization.

53.     On-chain data reported by Lookonchain revealed that a wallet associated with an ai16z managing partner known as "Logan" sold substantial holdings of $eliza immediately before Walters' uppercase announcement, consistent with advance knowledge of the planned launch. One trader turned a $1,900 position into approximately $3.67 million in hours. A substantial concentration of the new $ELIZA supply was held by a small number of wallets at launch. This was not a community launch, instead was a concentrated, insider-controlled deployment in which the "community" was buying tokens from a small group of insiders at inflated prices.

54.     The $ELIZA episode is significant because it demonstrated the pattern that repeated throughout the scheme: Walters provided promotional amplification for financial products that benefited insiders, maintained plausible deniability about his role, and retail participants absorbed the losses.

**The Digital Infrastructure**

55.     While leveraging the a16z association to build credibility from the outside, Defendants simultaneously constructed a comprehensive digital infrastructure designed to make the

project appear legitimate from the inside. An investor conducting ordinary due diligence would encounter exactly the kinds of materials that real technology companies produce.

56. The website at elizaos.ai presented the project as "Your Agentic Operating System." It featured detailed architectural descriptions and listed capabilities including a "Unified Message Bus," "Composable Swarms," "Strategic Action Chaining," and a "Modular Open-Source Architecture." A "Trusted by" section prominently displayed logos for Stanford, Chainlink, and Doodles, alongside a scrolling marquee of additional claimed partners.

57. A documentation portal at docs.elizaos.ai provided installation guides, quickstart tutorials, agent configuration documentation, deployment guides, and a plugin registry listing over 200 available plugins. These materials communicated to consumers that ElizaOS was a functional software product with an active development team and a growing user base.

58. GitHub repositories under the "elizaOS" organization showed hundreds of contributors and thousands of forks. Defendants represented that the framework had deployed over 50,000 agents and that ecosystem projects surpassed $20 billion in combined value. These figures were not independently verified.

59. The infrastructure was persuasive because it was comprehensive. It addressed every checkpoint an investor might use to evaluate a technology company: product website, technical documentation, developer ecosystem metrics, institutional partnerships, and media presence. Together, these elements created the appearance of a functioning venture.

60.     In reality, the enterprise generated no revenue. The ElizaOS framework was a free open-source software that produced no licensing fees, no subscription income, and no commercial returns. Its primary function within the scheme was extraction: each project built on the framework was required to contribute up to 10% of its token supply to the Walters-controlled treasury, generating a continuous flow of assets to insiders regardless of whether any ecosystem project produced real value.

**December 2024: Institutional Positioning**

61.     In early December 2024, Defendants announced a partnership with Stanford University's Future of Digital Currency Initiative ("FDCI"). The announcement associated the project with one of the world's most prestigious academic institutions, lending it a credibility that would influence any investor evaluating the project's legitimacy.

62.     According to reporting by Blockworks, a leading crypto publication, Defendants contributed more than $250,000 to Stanford to secure the affiliation.

63.     Defendant Walters used the Stanford partnership to gain press attention. He was quoted stating: "We're looking for Ph.D's to blow our minds and expand the realm of what's possible with the technology that we're unlocking."

64.     Defendant Walters knew or should have known that this statement was false, or at a minimum, that both the relationship with Stanford and any associated Ph.Ds, would not yield any result that would "blow our minds and expand the realm of what's possible" because his projects were fictionalized startups.

65.     The association with Stanford was part of the Defendants' repeated pattern of associating with powerful brands to deceive the investing public. While troubling, this form of

investment deception has a storied history dating back to the Gilded Age's financial charlatans.

66. On December 24, 2024, Skely, identified as an ai16z community developer, launched the aiPool presale using the Eliza framework. It raised 25,000 SOL ($4.72 million) in 60 minutes. Walters publicly endorsed the project. Skely's X account was frozen shortly before launch for "impersonation."

67. The aiPool presale followed the same structure as the $ELIZA episode: a nominally independent actor launched a financial product that directly benefited the ai16z ecosystem, Walters provided promotional amplification, and a significant sum of money was raised from retail participants in a short window.

68. From approximately December 26, 2024, Walters conducted a promotional tour through Shanghai, Beijing, and Hong Kong, attending community events and expanding the project's reach to Asian markets. The tour projected the international presence of a real technology startup.

69. In late December 2024, ai16z publicly announced plans to develop the project into an L1 blockchain. Walters also publicly announced plans for revenue-generating products, with mechanisms to use product revenues to buy back $AI16Z tokens from the market, a structure designed to drive token price appreciation. The token surged 37% in 24 hours. Market capitalization reached $1.9 billion.

70. The Layer-1 blockchain has not materialized as of the date of this filing. These announcements were made at moments calculated to sustain speculative momentum, the Layer-1 announcement came around New Year's Eve, positioned to drive buying into the new year.

**January 2025: The Peak and Insider Extraction**

71.    On January 2, 2025, the $AI16Z token reached its all-time high of approximately $2.47 per token. Market capitalization exceeded $2.6 billion. The enterprise had generated no revenue, delivered no functional AI product, and provided no value independent of the narrative Defendants had constructed.

72.    On January 3, 2025, one day after the all-time high, large holders began liquidating. One sold 1.14 million AI16Z tokens for $2.52 million. Another sold for $2.49 million. A third dumped $4.77 million worth. The token's price dropped 15% or more within 24 hours.

73.    By January 10, 2025, the token was trading at $1.51, a 39% decline from its peak in eight days.

74.    By January 11, on-chain data showed the most profitable ai16z trader had realized $39 million in profit. The third-most profitable trader had realized $19 million. Both had sold almost all of their tokens.

75.    These exits by early, large holders, during a period when Defendants continued promoting the project, are consistent with insiders monetizing their positions while retail purchasers continued buying.

76.    On January 14, 2025, Defendants published a whitepaper on arXiv, the academic preprint server. Legitimate technology companies publish whitepapers before fundraising to establish technical viability.

77.    This whitepaper was published twelve days after the token reached a $2.6 billion peak. Its function was not technical, it was another legitimizing artifact added to the apparatus after the speculative cycle had already run.

78. On January 15, 2025, Walters served as a featured judge at the SolanAmerica NYC | Alliance & Solana Ideathon in New York, further projecting the profile of a legitimate technology founder.

79. On January 25, 2025, Walters announced a $10 million "Magic Fund" in partnership with Jupiter Exchange, one of the largest decentralized exchanges on Solana. The fund announcement associated the project with a reputable ecosystem player, created a "giving back" narrative, and generated positive press during a period of declining token price.

80. On January 28, 2025, Chris Dixon, managing partner of a16z Crypto, revealed on the Unchained podcast that Andreessen Horowitz had asked the project to change its name due to brand confusion. Walters announced the rebrand to ElizaOS and stated there would be no new tokens and no changes to the roadmap.

81. The token was trading at $0.58, down 53% in 30 days. The brand that had powered the scheme's credibility from day one was being taken away. A company with real products and revenue can survive a forced name change. This project had no revenue, no functional product, and no business model independent of the narrative, and the name was the narrative's most powerful element.

**February–April 2025: Decline and Pivot**

82. On February 16–17, 2025, Walters' X account was reportedly compromised. Hackers promoted a fraudulent token, the $AI16Z token dropped approximately 15%, and trading volume spiked to $86.2 million in 24 hours.

83. By March 7, 2025, the token had fallen below $0.20 and was trading sideways in the $0.10–$0.20 range, a 92% decline from its January peak.

84. Through March and early April 2025, Walters announced preparations for Auto.fun, a no-code platform for launching AI agent tokens. On April 13, he described it as an "anti-pump" platform. On April 14, the token was trading at $0.1371, 95% below its all-time high.

85. On April 17, 2025, counterfeit "auto.fun" tokens appeared on Pump.fun. Walters purchased some with his public wallet. The tokens pumped to a $2.5 million market cap, then crashed toward zero. Community members accused Walters of participating in a rug pull. Walters denied being the developer and stated he burned the tokens after learning they were counterfeit.

86. On April 17, 2025, Auto.fun officially launched with over 15 initial launch partners, with $ai16z designated as the platform's native token. The launchpad was designed to drive volume back to $ai16z by projecting the appearance of a functioning company ecosystem, consistent with Defendants' broader pattern of associating the token with surface-level signals of legitimacy.

87. The system depended entirely on a continuous stream of new project launches to generate this demand. When launches slowed, the artificial demand disappeared. This is the structural signature of an enterprise that cannot sustain itself on its own fundamentals.

88. By April 29, 2025, on-chain data showed a single wallet held 7.11% of the total ai16z supply, and the top five wallets controlled a significant and concentrated portion. This concentration was inconsistent with the decentralized, community-driven governance Defendants had represented.

**October–November 2025: The Token Migration**

89.    Beginning in October 2025, Defendants announced a token migration from $AI16Z to $ELIZAOS, with the migration portal going live on November 6, 2025. The new positioning was "functional backbone of an agent-powered economy"—yet another evolution in a series of narratives (AI-managed fund, open-source framework, Layer-1 blockchain, launchpad, now "backbone"), each grander than the last, yet none supported by revenue.

90.    The migration was structured at a stated exchange ratio of one old token for six new tokens, but expanded the total supply tenfold, from 1.1 billion to 11 billion tokens.

91.    Of the new 11 billion tokens, only 60% went to existing holders through the exchange. The remaining 40% was allocated to Defendants and their affiliates: 15% (1.65 billion tokens) to undisclosed private investors, 10% (1.1 billion tokens) to team and contributors, and the remainder to liquidity, foundation, and ecosystem allocations controlled by Defendants.

92.    For every six tokens an existing holder received, an additional four were created for Defendant-controlled entities. Existing holders' percentage ownership of the ecosystem was diluted by approximately 40%. The migration was presented as a technology upgrade but functioned as a dilutive transfer of value from public purchasers to insiders.

93.    The allocation of 15% to private investors revealed that Defendants had raised substantial capital through agreements that were never disclosed to public purchasers. These investors received tokens at terms unavailable to the public. The existence, terms, and beneficiaries of these agreements were material facts that Defendants omitted from their public representations.

94. The cross-chain expansion via Chainlink's CCIP to Ethereum, Base, and BNB Chain broadened the potential buyer pool to consumers on other blockchains who may not have been aware of the project's history on Solana. This served the same purpose as the original brand appropriation: bringing new consumers into the scheme on the strength of a refreshed narrative.

95. The migration required existing holders to connect their wallets, select amounts, and execute swaps to preserve their investment. Insiders received their allocations by design. The requirement that public purchasers take affirmative action, or lose their investment, while insiders received their tokens automatically illustrates the asymmetry at the heart of the scheme.

96. On October 31, 2025, Binance Alpha and Binance Futures supported the token swap, facilitating the migration.

97. On December 23, 2025, Korean DAXA member exchanges listed AI16Z as a "trading warning" coin, citing the project team's failure to provide timely, transparent, and reasonable disclosure of important matters that may affect the token's value.

98. On November 13–15, 2025, Coinbase announced and then executed suspension of AI16Z perpetual contract trading. These actions by regulated market participants confirmed what the project's structure had always implied: the token presented risks to consumers that Defendants had failed to disclose.

**The Consequences**

99. Plaintiff's and the Class's losses were not the result of ordinary market volatility, unforeseen technological challenges, or the inherent risks of cryptocurrency. They were the direct consequence of Defendants' scheme to manufacture the appearance of a

legitimate technology venture and extract value from consumers who relied on that appearance.

100. The project generated no revenue from product sales, licensing, subscriptions, or any other legitimate business activity during the Class Period. Unlike a legitimate startup, whose valuation, however speculative, is anchored to some expectation of future revenue, this project had no economic foundation independent of the narrative Defendants constructed and the tokens they sold.

101. At least 3,945 wallet addresses reflecting customer holdings sustained losses. The actual number of affected consumers is substantially higher, as many held tokens through centralized exchanges or across multiple wallets.

102. The token's price responded directly to Defendants' conduct throughout the Class Period: surging to $80 million after the Andreessen acknowledgment, surging 55% after the Lazzarin interaction, surging 37% after the Layer-1 announcement, dropping 87% after the $ELIZA launch, and dropping 15% after the hack. These responses confirm that the market priced the token based on Defendants' promotional activity, not on business fundamentals.

103. Defendants possessed material non-public information throughout the Class Period, including the human-operated nature of the AI agent, insider wallet activities, the existence and terms of private investor agreements, the planned migration and supply expansion, and the true state of the technology relative to public representations.

104. The total value extracted by Defendants through the scheme's various mechanisms is substantial, though its precise magnitude requires discovery. Known extraction channels include the initial fundraise, the 10% ecosystem-project token allocation, private investor

21

proceeds, team allocations, newly created treasury tokens, platform fees collected by DAOs.fun, Auto.fun creation and trading fees, and profits from insider liquidations.

## V. CLASS ALLEGATIONS

**Class Definition**

105.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

*All persons and entities who purchased, acquired, or held $AI16Z tokens (subsequently migrated to $ELIZAOS tokens) during the period from October 24, 2024 through the date of the filing of this Complaint (the "Class Period") and who suffered losses as a result of Defendants' conduct described herein (the "Class").*

106.   Excluded from the Class are: (a) Defendants and their officers, directors, agents, and employees; (b) members of the immediate families of any Defendant; (c) any entity in which any Defendant has a controlling interest; (d) institutional market-makers and liquidity providers; (e) persons who are bound by an enforceable arbitration agreement with Defendants covering the claims asserted herein and who do not opt out of such agreement; (f) any judge assigned to this action; and (g) the legal representatives, heirs, successors, and assigns of any excluded person.

107.   Plaintiff reserves the right to amend the Class definition based on information obtained in discovery.

**Numerosity (Rule 23(a)(1))**

108. The Class is so numerous that joinder of all members is impracticable. On-chain data reflects at least 3,945 unique wallet addresses that sustained losses. The actual number of Class members is substantially larger, as many held tokens through centralized exchanges or across multiple wallets. The precise number can be ascertained through blockchain transaction data and Defendants' internal records.

**Commonality (Rule 23(a)(2))**

109. There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including but not limited to: (a) whether Defendants engaged in deceptive acts or practices in violation of New York General Business Law §349; (b) whether Defendants' public representations were materially misleading; (c) whether Defendants manufactured the appearance of a legitimate technology venture to induce consumer purchases; (d) whether the brand appropriation of Andreessen Horowitz constituted a deceptive practice; (e) whether the digital infrastructure, including the website, documentation portal, and GitHub repositories, was designed to create a misleading appearance of legitimacy; (f) whether Defendants engaged in unlawful, unfair, or fraudulent business acts or practices in violation of California Business & Professions Code §17200 et seq.; (g) whether Defendants disseminated untrue or misleading statements in violation of California Business & Professions Code §17500 et seq.; (h) whether Defendants were unjustly enriched at the expense of Class members; (i) whether Defendants owed and breached a duty of care to provide truthful information; (j) the proper measure of damages; and (k) whether Plaintiff and the Class are entitled to injunctive or equitable relief.

**Typicality (Rule 23(a)(3))**

23

110.    Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members purchased the same tokens, were exposed to the same misleading representations through the same public channels, were subject to the same token migration and supply dilution, and suffered the same types of injury. Plaintiff's claims arise from the same course of conduct that gives rise to the claims of the Class.

**Adequacy (Rule 23(a)(4))**

111.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are not antagonistic to or in conflict with the interests of the Class. Plaintiff has retained counsel experienced in class action litigation and consumer fraud matters, who will vigorously prosecute this action on behalf of the Class.

**Predominance and Superiority (Rule 23(b)(3))**

112.    Common questions of law and fact predominate over any questions affecting only individual Class members. Defendants' representations were made uniformly to the entire market through public channels. The token mechanics, migration terms, and supply expansion affected all holders identically.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the large number of Class members makes individual joinder impracticable; (b) individual damages for many Class members may be relatively small, making individual prosecution economically infeasible; (c) this Court is an appropriate forum given that Defendants are subject to personal jurisdiction in this District; and (d) the claims involve common proof and can be managed efficiently as a class action.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Deceptive Business Practices in Violation of New York General Business Law §349**

*(Against All Defendants, on Behalf of the Class)*

114.    Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

115.    New York General Business Law §349 declares unlawful all "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

116.    Defendants engaged in deceptive acts and practices by, among other things: (a) constructing a digital infrastructure designed to make the project appear to be a legitimate technology venture, including the elizaos.ai website, the docs.elizaos.ai documentation portal, and GitHub repositories with inflated contributor and fork counts; (b) misrepresenting the token as governed by an autonomous AI agent when it was operated by humans; (c) appropriating the brand identity of Andreessen Horowitz to manufacture the appearance of institutional backing; (d) concealing material information regarding insider holdings, private investor agreements, and planned token supply expansion; (e) executing a token migration presented as a technology upgrade that functioned as a dilutive transfer of value to insiders; and (f) making false and misleading statements regarding the project's technology, governance, partnerships, and economic model.

117.    Defendants' deceptive conduct was consumer-oriented. The tokens were marketed and sold to thousands of consumers through social media, websites, media appearances, and public events, including consumers in New York.

118. Defendants' deceptive acts were material. A reasonable consumer would consider the false representations regarding AI governance, institutional affiliation, technology capabilities, and token economics to be important factors in deciding whether to purchase the tokens. The depth and precision of the digital infrastructure made ordinary consumer diligence unusually unlikely to reveal the fraud.

119. As a direct and proximate result of Defendants' deceptive acts, Plaintiff and the Class suffered injury, including financial losses from purchasing tokens at artificially inflated prices.

120. Pursuant to N.Y. GBL §349(h), Plaintiff seeks actual damages or fifty dollars, whichever is greater, treble damages up to one thousand dollars upon a showing that Defendants' violations were willful or knowing, reasonable attorney's fees, and injunctive relief.

121. Defendants' violations were willful and knowing. Defendants had actual knowledge that the AI agent was human-operated, that insider positions were being monetized, that the token's value was artificially inflated, and that the digital infrastructure was designed to create a misleading appearance of legitimacy.

## SECOND CLAIM FOR RELIEF

### False Advertising in Violation of New York General Business Law §350

*(Against All Defendants, on Behalf of the Class)*

122. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

123. New York General Business Law §350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

124. Defendants engaged in false advertising by disseminating untrue and misleading statements through X, the ElizaOS website, the documentation portal, the migration portal, Medium articles, Discord servers, governance forums, podcasts, YouTube interviews, and statements to cryptocurrency media outlets. These statements included: (a) that the token was governed by an autonomous AI-managed venture fund; (b) that the project was affiliated with or endorsed by Andreessen Horowitz; (c) that the ElizaOS framework, Auto.fun, Eliza Cloud, and a proposed Layer-1 blockchain were functional or forthcoming; (d) that institutional partnerships with Stanford and others validated the project's technology; (e) that the token migration was a technology upgrade rather than a dilutive event; and (f) that revenue-generating buyback mechanisms would be implemented.

125. Defendants' false advertising was misleading in a material respect and had the capacity to deceive consumers. Plaintiff and the Class purchased tokens at artificially inflated prices in reliance on these representations.

126. As a direct and proximate result, Plaintiff and the Class suffered injury in fact and lost money and property. Plaintiff seeks compensatory damages, injunctive relief, and all other relief available under N.Y. GBL §350 et seq.

## THIRD CLAIM FOR RELIEF

**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200 et seq.**

*(Against All Defendants, on Behalf of the Class)*

127. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

27

128. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 et seq., prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

129. California has substantial contacts with the misconduct alleged herein. Defendant Eliza Labs maintains its principal place of business in San Francisco, the AI16Z project was co-conceived in San Francisco, and substantial aspects of the challenged conduct were directed from California.

130. Defendants engaged in unlawful business acts by violating N.Y. GBL §§349 and 350, California's False Advertising Law, and the common-law duties against misrepresentation pleaded herein.

131. Defendants engaged in unfair business acts by conducting a scheme that offended established public policy, was immoral and unscrupulous, and caused substantial injury to consumers not outweighed by any countervailing benefit.

132. Defendants engaged in fraudulent business acts because their representations concerning AI governance, institutional affiliation, technology capabilities, and token economics were likely to deceive members of the consuming public.

133. As a direct and proximate result, Plaintiff and the Class suffered injury in fact and lost money and property. Pursuant to Cal. Bus. & Prof. Code §17203, Plaintiff seeks restitution and such injunctive and equitable relief as may be necessary.

**FOURTH CLAIM FOR RELIEF**

**Violation of California's False Advertising Law, Cal. Bus. & Prof. Code §17500 et seq.**

*(Against All Defendants, on Behalf of the Class)*

134. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

135. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500, prohibits the dissemination of any statement concerning property or services that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

136. Defendants disseminated statements that were untrue and misleading, including representations about AI governance, institutional affiliation, technology capabilities, token economics, buyback mechanisms, and the nature of the token migration, through X, the ElizaOS website, the documentation portal, Medium, Discord, podcasts, YouTube, and press outlets.

137. Defendants knew, or in the exercise of reasonable care should have known, that these statements were untrue or misleading.

138. As a direct and proximate result, Plaintiff and the Class suffered injury in fact and lost money or property. Pursuant to Cal. Bus. & Prof. Code §17535, Plaintiff seeks restitution and injunctive relief.

**FIFTH CLAIM FOR RELIEF**

**Negligent Misrepresentation**

*(Against All Defendants, on Behalf of the Class)*

139. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

140. Defendants made representations of material fact concerning the nature, utility, governance, value, and prospects of the $AI16Z/$ELIZAOS token and the AI16Z/ElizaOS project as described above.

141. Defendants had a duty to provide correct information because they held themselves out as possessing unique expertise regarding blockchain technology and AI-driven financial

29

products, and positioned themselves as trusted sources through their public communications, developer documentation, institutional partnership claims, and media appearances.

142. Defendants made these representations without reasonable grounds for believing them to be true. They knew or should have known that the AI fund was human-operated, governance was illusory, insiders were monetizing their positions, and the technology promises were speculative marketing unsupported by reality.

143. Plaintiff and the Class justifiably relied upon Defendants' misrepresentations in making their investment decisions. The misrepresentations concerned information to which only Defendants had access, and the comprehensive digital infrastructure made ordinary diligence unusually unlikely to reveal the fraud.

144. As a direct and proximate result of Plaintiff's and the Class's justifiable reliance, they suffered financial losses in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

*(Against All Defendants, on Behalf of the Class)*

145. Plaintiff re-alleges and incorporates by reference each allegation set forth above. This claim is pleaded in the alternative to the statutory claims above pursuant to Fed. R. Civ. P. 8(d)(2).

146. Defendants have been unjustly enriched at the expense of Plaintiff and the Class by receiving and retaining revenues, profits, and benefits derived from the scheme, including proceeds from the initial offering, the 10% ecosystem-project token allocation, private

30

investor proceeds, team allocations, treasury tokens, platform fees, Auto.fun fees, and profits from insider liquidations.

147.   Plaintiff and the Class conferred a benefit upon Defendants by purchasing $AI16Z/$ELIZAOS tokens. Their capital directly funded the market liquidity that Defendants exploited through insider positions, treasury control, and the various extraction mechanisms described herein.

148.   Defendants accepted these benefits with knowledge that they were conferred based on false representations, and retention of these benefits would be inequitable and unconscionable.

149.   Plaintiff seeks restitution and disgorgement of all revenues, profits, and benefits wrongfully obtained, in an amount to be determined at trial.

## VII. PRAYER FOR RELIEF

150.   WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that this Court enter judgment against Defendants, jointly and severally, and grant the following relief:

(a)   An order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), designating Plaintiff as Class Representative, and designating Plaintiff's counsel as Class Counsel;

(b)   An order directing that reasonable notice be given to Class members pursuant to Fed. R. Civ. P. 23(c)(2)(B);

(c)   An award of actual damages to Plaintiff and the Class, including but not limited to out-of-pocket losses, the difference between the price paid and the actual value of the

tokens at the time of purchase, overpayment damages, and consequential damages, in an amount to be proven at trial;

(d) An award of damages to Plaintiff and each Class member pursuant to N.Y. GBL §349(h), including actual damages or fifty dollars, whichever is greater, with discretionary trebling up to one thousand dollars upon a finding of willful or knowing violation;

(e) An award of damages to Plaintiff and each Class member pursuant to N. Y. GBL §350-e(3), including actual damages or five hundred dollars, whichever is greater, with discretionary increase up to ten thousand dollars upon a finding of willful or knowing violation, plus reasonable attorney fees;

(f) An award of compensatory damages to Plaintiff and the Class for all losses proximately caused by Defendants' negligent misrepresentations, in an amount to be proven at trial;

(g) Restitution of money or property wrongfully obtained from Plaintiff and the Class, including traceable platform fees or other amounts actually received by Defendants through the unlawful conduct alleged herein, in amounts to be proven at trial;

(h) Imposition of a constructive trust over specifically identifiable digital assets, including the publicly disclosed treasury wallets, the token treasury, and Defendant-controlled token allocations, to the extent traceable to the conduct alleged herein;

(i) A preliminary and permanent injunction restraining Defendants, to the extent permitted in equity, from transferring, dissipating, encumbering, or otherwise disposing of specifically identifiable, traceable assets derived from the conduct

32

described herein, including the treasury wallets, platform fee wallets, and any other cryptocurrency wallets or accounts controlled by Defendants that received proceeds from the scheme;

(j)    An award of reasonable attorney fees and costs pursuant to N.Y. GBL §349(h) and as otherwise permitted by law, including costs of notice to the Class;

(k)    An award of prejudgment interest to Plaintiff and Class members at the statutory rate from the date of each wrongful act through the date of judgment; and

(l)    Such other and further relief as this Court deems just, proper, and equitable.

## VIII. JURY DEMAND

151.    Plaintiff, on behalf of himself and all Class members, hereby demands a trial by jury on all issues so triable.

Dated: April 20, 2026
New York, New York

Respectfully submitted,
BURWICK LAW, PLLC

By: /s/ Max Burwick
Max Burwick, Esq.
One World Trade Center, 84th Floor
New York, NY 10007
Tel: (646) 762-1080
max@burwick.law

*Counsel for Plaintiff and the Proposed Class*

33